UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION

| | |
|---|---|
| KEVIN BEARY, SHERIFF OF ORANGE COUNTY, FLORIDA, IN HIS OFFICIAL CAPACITY, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFF,<br><br>v.<br><br>NATIONWIDE LIFE INSURANCE CO., NATIONWIDE RETIREMENT SOLUTIONS, INC., and NATIONWIDE FINANCIAL SERVICES, INC.,<br><br>DEFENDANTS. | CIVIL ACTION NO. C2 06 967<br><br>JUDGE SARGUS<br><br>MAGISTRATE JUDGE KING<br><br>JURY DEMANDED |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff, through his counsel, hereby alleges as follows:

### I. SUMMARY OF THE ACTION

1. This is an action for equitable relief under state fiduciary law. It seeks to recover, for the benefit of Plaintiff's 457(b) plan[1] and all other similarly situated plans, benefits (hereinafter referred to as the "revenue sharing payments") from mutual funds, mutual fund advisors and other investment advisors (hereinafter sometimes collectively referred to as "Investment Advisors") received and wrongfully kept by Defendants Nationwide Life Insurance Company, Nationwide Retirement Solutions, Inc., and/or Nationwide Financial Services, Inc. (hereinafter sometimes collectively referred to as "Nationwide").

2. Nationwide's arranging for revenue sharing payments by Investment Advisors

-1-

and retaining such payments for its own benefit constitute breaches of its fiduciary duties under state law, making the payments subject to disgorgement.  Alternatively, to the extent Nationwide's conduct does not constitute a breach of its fiduciary duties, it is unjust under the circumstances for Nationwide to retain the revenue sharing payments, making them subject to restitution to Plaintiff and other sponsors of 457(b) plans.

      3.      Plaintiff brings this action, on his own behalf and on behalf of all those similarly situated, under state law to recover the following relief:

- An accounting of each 457(b) plan's investments and related revenue sharing payments;

- A declaratory judgment holding that the acts of Nationwide described herein constitute breaches of its fiduciary duties;

- A permanent injunction against Nationwide prohibiting the practices described herein;

- Disgorgement/restitution of all the revenue sharing payments received by Nationwide and/or its subsidiaries and affiliates; and

- Any other legal or equitable relief deemed by the Court to be fair and just.

## II.    THE PARTIES

      4.      Plaintiff Kevin Beary, Sheriff of Orange County, Florida, is the sponsor of the Sheriff's Office of Orange County, Florida Section 457(b) Deferred Compensation Plan ("the Plan").  The Plan, a benefit offered to members of the Sheriff's Office of Orange County, Florida, is a deferred compensation program under 26 U.S.C. § 457(b) and (g).  Plaintiff brings this action on behalf of the Plan in his official capacity as Sheriff of Orange County, Florida, and sponsor of the Plan.  Plaintiff resides in Orange County, Florida.

---

[1] A 457(b) plan is a non-qualified tax-deferred compensation plan that works very much like other retirement plans such as 403(b) and 401(k) plans.  Created in 1978, the name refers to Section 457(b) of the Internal Revenue Code, which provides for such plans.

5. Defendant Nationwide Life Insurance Company ("Nationwide Life") is a wholly owned subsidiary of Nationwide Financial Services, Inc. Nationwide Life has its principal place of business in Columbus, Ohio.

6. Defendant Nationwide Retirement Solutions, Inc. ("NRS"), is a wholly owned subsidiary of Nationwide Financial Services, Inc. NRS has its principal place of business in Dublin, Ohio.

7. Defendant Nationwide Financial Services, Inc. ("NFS"), is a Delaware corporation which has its principal place of business in Columbus, Ohio. Directly and/or through its subsidiaries, including, but not limited to, Nationwide Life and NRS, NFS provides saving and retirement products. NFS is the third largest writer of variable annuity contracts in the United States.

### III.  JURISDICTION AND VENUE

8. Both the National Class and the Florida Class, defined below, include members who are citizens of states differing from the states of Defendants' citizenship. The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. Therefore, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A).

9. Venue of this action in the Southern District of Ohio is proper pursuant to 28 U.S.C. § 1391(a) because: (i) Defendants reside in the district, and (ii) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the district.

### IV.  EVENTS UNDERLYING THE CLAIMS

*A.  PLAINTIFF.*

10. From at least January 1, 1996, to the present date, the Plan was and is a participant directed 457(b) deferred compensation retirement plan. Plan participants each had and have their own individual accounts in the Plan, which they funded. Under the Plan and

through the Plan's contracts with Nationwide, participants were entitled to invest in the various mutual funds and other investment products selected for inclusion in the investment platform by Nationwide.

11.     Including Plaintiff's Plan, at least seven thousand six hundred (7,600) 457(b) retirement plans are members of the National Class, as defined below, that contracted with Nationwide Life for Nationwide Life to provide variable annuity investment platforms for the investment of their assets during the Class Period.  Including Plaintiff's Plan, at least five hundred fifty (550) 457(b) retirement plans are members of the Florida Class, as defined below, that contracted with Nationwide Life for Nationwide Life to provide variable annuity investment platforms for the investment of their assets during the Class Period.  The vast majority of Class members remain under contract with Nationwide Life to this day.

B.     THE RELATIONSHIP BETWEEN CLASS MEMBERS, NATIONWIDE AND THE MUTUAL FUNDS.

12.     The Class consists of the public employers[2] who sponsored 457(b) plans for their employees.[3]  Their 457(b) plans were exclusively or predominately prototype plans drafted by NRS (or its predecessor, Public Employees Benefit Services Corporation or "PEBSCO") and offered to Class members by NRS and, in many cases, also by an entity of which Class members were members (*e.g.*, the National Association of Counties).  Under these arrangements, Class members contracted with NRS to act as the administrator of their plans and purchased group variable annuity contracts from Nationwide Life in which to invest plan assets.

---

[2] Local and state governments are eligible to establish 457(b) plans for their employees.  This includes a state (including the District of Columbia), a political subdivision of a state, and an agency or other instrumentality of a state.

[3] These employees include state and local government workers, police personnel, firefighters, and teachers and other public school employees.

13. For example, on August 30, 1989, Plaintiff, PEBSCO, and the National Association of Counties ("NACo") entered into the National Association of Counties Deferred Compensation Program Member County Administrative Agreement ("the Administrative Agreement"), a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein by reference. As set forth in the Administrative Agreement, NACo sponsored a prototype deferred compensation program pursuant to Section 457 of the Internal Revenue Code for the benefit of its member counties and other entities, such as Plaintiff, approved by NACo's president. Pursuant to the Administrative Agreement, Plaintiff agreed to employ PEBSCO (now NRS) as the administrator of the plan, to use the NACo plan document drafted by PEBSCO, and to accept the group variable annuity contracts offered by Nationwide Life. Upon information and belief, all or the vast majority of Class members entered into substantially similar administrative agreements to which NRS or its predecessor, PEBSCO, were parties.

14. On August 30, 1989, the Plan, which was drafted by PEBSCO, became effective, a true and correct copy of which Plan is attached hereto as Exhibit "B" and incorporated herein by reference. Effective January 1, 1997, NRS and NACo unilaterally amended the plans of all Class members who had NACo plans, including Plaintiff. A true and correct copy of the January 1, 1997 version of the Plan is attached hereto as Exhibit "C" and incorporated herein by reference. Effective January 1, 2002, NRS and NACo unilaterally amended the plans of all Class members, including Plaintiff, who had NACo plans. A true and correct copy of the amended plan effective as of January 1, 2002, is attached hereto as Exhibit "D" and incorporated herein by reference.

15. Pursuant to standard form group annuity contracts between Nationwide Life and Class members, Nationwide Life maintains individual accounts for plan participants.

Nationwide Life offers two types of group annuity contracts: (i) flexible fund retirement contracts, and (ii) fixed fund retirement contracts. Pursuant to the flexible fund retirement contracts, Nationwide Life provides an investment platform of mutual funds, and the plan participants choose in which of the provided funds they will invest their deferred compensation. Under the fixed fund retirement contracts, Nationwide Life is obligated to pay guaranteed interest rates on funds invested therein.

16. For example, on August 31, 1989, Nationwide Life issued a Group Flexible Fund Retirement Contract (TSP 556) to Plaintiff, a true and correct copy of which, as amended, is attached hereto as Exhibit "E" and incorporated herein by reference. Likewise, on August 31, 1989, Nationwide issued a Group Fixed Fund Retirement Contract (TSP 557) to Plaintiff, a true and correct copy of which, as amended, is attached hereto as Exhibit "F" and incorporated herein by reference. Upon information and belief, all the members of the Class had identical or substantially similar group flexible fund retirement contracts issued to them by Nationwide Life, and many Class members also had identical or substantially similar group fixed fund retirement contracts issued to them by Nationwide Life.

17. The flexible fund contracts provided for payment by Class members to Nationwide of Variable Account Annual Expense Fees calculated as a percentage of the value of a Class member's investment in the variable account in which Nationwide held the shares of the underlying mutual funds, along with a "Contingent Deferred Sales Charge" if a Class member withdrew its investments from Nationwide within a specified number of years after contract inception. These contracts expressly provided that the Variable Account Annual Expense Fee was to compensate Nationwide Life for "various risks assumed by the Company and for the administration of the Variable Account." In addition, the contracts allowed for "a flat dollar Participant Account Maintenance Charge" to be charged to each participant if agreed upon

between the Class member and Nationwide Life. This optional charge was to further compensate Nationwide Life for maintaining individual records with respect to each participant. The flexible fund contracts did not provide for Nationwide Life to receive any other benefits.

18.     In return for its charges to Class members, Nationwide Life provided all the services necessary for the administration of the contract, including participant and plan record keeping, participant servicing, and communications with plan participants and Class members. None of the group flexible fund annuity contracts (which are standard forms) provided for, or even referenced, payments by Investment Advisors to Nationwide.

19.     Technically, the Class members and their participants in the group flexible fund contracts did not invest directly in the mutual funds. Rather, Class members and their participants invested in a "variable account" established by Nationwide Life. Many Class members, including Plaintiff, held group flexible fund annuity contracts providing for investment in the "NACo Variable Account." The variable accounts established by Nationwide kept their assets separate from the general assets of Nationwide Life, and they were not chargeable with any of Nationwide Life's liabilities outside of the variable account.

20.     The variable accounts, including the NACo Variable Account, were and are divided into sub-accounts that correspond to the mutual funds and other investment options available under the annuity contracts. Pursuant to the contracts, participants choose (from the available options) the investments in which their contributions and any matching contributions made by their employers are invested, and Nationwide Life allocates those contributions to particular sub-accounts within the variable account which correspond to the chosen mutual funds. In return for their contributions, Class members and their participants receive accumulation units (shares) of the variable accounts, which accumulation units are held by Nationwide Life. In this respect, the variable accounts are like mutual funds. When people

invest in a mutual fund, they receive shares of the mutual fund; they do not have an ownership interest in the stocks owned by the mutual fund.

21. Based on the combined contributions to the sub-accounts made by all the Class members and their participants, Nationwide Life sells and purchases mutual fund shares to hold in the variable accounts. The value of a Class member's accumulation units (shares) in the variable account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

22. According to a report released by the Pension and Welfare Benefits Administration (renamed the Employee Benefits Security Administration, effective April 3, 2003), an agency of the Department of Labor:

> *Mutual funds are pools of financial instruments that may include stocks, bonds, commercial paper, cash, and other instruments. Shares of mutual funds are bought by investors, including 401(k) plans. The shares represent an undivided common interest in the pool of investments. The share holders benefit by receiving the earnings of the investments in the form of additional shares and by a capital gain when the shares are redeemed from the mutual fund.*

Economic Systems, Inc., *Final Report, Pension & Welfare Benefits Admin., Dept. of Labor, Study of 401(k) Plan Fees & Expenses* § 2.4.1 (1998), *available at* http://www.dol.gov/ebsa/pdf/401kRept.pdf (last visited Nov. 7, 2006). Mutual funds generally do not have employees and must contract with various entities to perform managerial, administrative, accounting, legal and other services. Mutual funds pay the entities providing those services.

23. Mutual funds pass those costs on to their investors by charging them a variety of fees, typically investment management fees, distribution fees or commissions, and marketing or 12(b)(1) fees. A mutual fund takes these fees from investors by paying to the investment manager, mutual fund advisor or other service provider out of its general assets a dollar amount

equal to the designated percentage of the net asset value of all of its shares, which causes the net asset value of all its shares to decrease by that percentage.  This causes the value of the mutual fund shares held by Nationwide Life in the variable accounts to decrease by that percentage, which in turn reduces the value of each participant's accumulation units (shares) of the Nationwide Life variable account correspondingly.

24. At all relevant times, the mutual funds offered by Nationwide Life to Class members, almost without exception, have not been the same mutual funds offered to individual investors.  Some have been "clone" funds created by the mutual fund companies for variable annuity contracts; they imitate funds the same mutual fund companies offer to the general public.  Others have been funds created specifically for variable annuity contracts, but they do not mimic funds offered to the general public by the same mutual fund companies.  Many of the funds have been owned and/or operated by Nationwide itself or its subsidiaries or affiliates.

25. The mutual funds set the percentages of the variable account's assets they take as fees (which fees have to be disclosed in the funds' prospectuses) so as to cover not only the fees they would normally charge, but also the amount of the revenue sharing payments they have to make to Nationwide, its subsidiaries or affiliates.  Simple economics dictated that if Nationwide had not required the mutual funds to make the revenue sharing payments, but rather had asked the funds to lower the fees they charged by a like amount, they would readily have agreed, because their revenue would have remained unchanged.

C.  THE RELATIONSHIP BETWEEN NATIONWIDE AND MUTUAL FUNDS/MUTUAL FUND ADVISORS PRIOR TO IMPLEMENTATION OF THE REVENUE SHARING SCHEME.

26. Prior to approximately January 1, 1996, Nationwide routinely performed certain services in conjunction with the investment of Class members' assets in mutual funds, such as maintaining separate records for each participant reflecting the mutual fund shares purchased and

redeemed and the mutual fund share balances of each participant; dispersing or crediting to participants all proceeds of redemptions of shares of the mutual funds and all dividends and other distributions not reinvested in shares in the mutual funds; preparing and transmitting periodic statements to participants; supporting and responding to service inquires from participants; maintaining and preserving records required by law to be maintained and preserved in connection with participants' investments in mutual funds; generating written confirmations and quarterly statements to participants; distributing to participants the mutual funds' prospectuses, etc.; and transmitting purchase and redemption orders to the mutual funds on behalf of the participants.  Performance of these services was necessary for Nationwide to conduct its business.  Nationwide provided these services to the Class members in return for compensation from them.

27.     Because it provided these services to Class members in return for compensation from them, prior to implementation of the revenue sharing scheme, Nationwide typically did not receive any revenue sharing or expense reimbursement from mutual funds/mutual fund advisors, although it may have received 50 cents per month ($6.00 per year) per participant from a very few funds.  Pricing Nationwide's services on a per participant basis made sense, because the costs associated with providing those services vary with the number of participants, not the amount of assets.

D.      *IMPLEMENTATION OF THE REVENUE SHARING SCHEME.*

28.     Beginning in 1993 and continuing into 1995, Nationwide became concerned that its pricing of group annuity contracts was becoming non-competitive, particularly in the medium-sized and large case portion of its target market ($5,000,000 and up).  Determined to lower its group annuity contract prices and match the competition without actually decreasing (or while actually increasing) the revenue generated by its annuity contracts, Nationwide began

investigating and ultimately implemented a scheme whereby mutual funds and/or mutual fund advisors made revenue sharing payments to it based upon a percentage of the Class members' assets invested in the mutual funds through Nationwide. Nationwide implicitly or explicitly made it a condition to offering a mutual fund family's funds that the mutual fund family pay it revenue sharing on a majority or all of its funds offered by Nationwide.

29.  In order to implement this scheme, Nationwide negotiated revenue sharing agreements with Investment Advisors. Revenue sharing payments were and are made to Nationwide pursuant to both written contracts ("revenue sharing contracts"), variously denominated as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and informal or implied agreements not reduced to writing with the investment management firms which provide to mutual funds the management and other services necessary for the funds to function. Revenue sharing payments are variously denominated in the written contracts as 12(b)(1) fees (which are supposed to be fees for marketing of the fund), administration fees, service fees and subtransfer agent fees.[4] The revenue sharing payments made pursuant to informal or implied agreements may have included payment for meals, trips and entertainment and directing of brokerage transactions paying substantial commissions to Nationwide or its affiliates or subsidiaries. All of the revenue sharing payments are based in whole or in overwhelming part on a percentage of a Class member's investment in a mutual fund.

30.  While the revenue sharing payments are described by Nationwide in the revenue sharing contracts as reimbursements for expenses incurred in providing services to the mutual funds, those services from which mutual funds and/or mutual fund advisors may incidentally

---

[4] To the extent that any written revenue sharing contracts denominate the revenue sharing payments as finder's fees, shareholder servicing fees or marketing reallowances, Plaintiff likewise seeks disgorgement/restitution of them.

benefit are actually ones which Nationwide had traditionally supplied to Class members as a necessary part of its business in return for charges collected from them, and those services did not change as a result of revenue sharing. Although the description of Nationwide's services may vary slightly from revenue sharing contract to contract, the actual services performed by Nationwide for Class members from which mutual funds may incidentally benefit are virtually identical in every case.

31. The revenue sharing payments are calculated based upon a percentage of the Class members' assets invested in the mutual funds through Nationwide. Such amounts bear no relationship whatsoever to the cost of providing the services or a reasonable fair market value for the services. Simply put, whether a plan participant has $10,000 or $100,000 in his or her account, the cost to handle transactions and maintain records is the same. Accordingly, in an open market, such services would be provided between unrelated parties on an annual per participant basis, as Nationwide provided them prior to its implementation of the revenue sharing scheme, and not on a percentage of assets basis. Furthermore, the market is such that no one other than Nationwide could or would ever provide these services, making the provision of these services an inherent part of Nationwide's business, such that the services provided by Nationwide would actually have no reasonable fair market value at all. In reality, therefore, the mutual funds are not paying Nationwide for the performance of services.

32. In summary, since approximately January 1, 1996, Nationwide (and/or Nationwide's subsidiaries or affiliates) has been arranging for, receiving, and keeping the revenue sharing payments for its own use and benefit in breach of its fiduciary duties under state law. These revenue sharing payments range from approximately 25 to in excess of 58 basis points on the total assets of Class members for each year of their contracts during the Class Period.

## V.    CLASS ACTION ALLEGATIONS

33.     This action is brought as a class action by Plaintiff in his official capacity as Sheriff and sponsor of the Plan on behalf of himself and the following defined National Class:

> All sponsors of 457(b) deferred compensation plans in the United States that had variable annuity contracts with Nationwide at any time during the Class Period.

34.     Alternatively, this action is brought as a class action by Plaintiff in his official capacity as Sheriff and sponsor of the Plan on behalf of himself and the following defined Florida Class:

> All sponsors of 457(b) deferred compensation plans in Florida that had variable annuity contracts with Nationwide during the Class Period.

All references heretofore and hereinafter to "Class" refer alternatively to both the National Class and the Florida Class. The Class Period is January 1, 1996, or the first date Nationwide began receiving revenue sharing payments from Investment Advisors, whichever came first, to the date class notice is provided. Because Nationwide's misconduct was continuing throughout the Class Period and caused continuing injury throughout the Class Period, the applicable statute of limitations has been (and remains) tolled throughout the Class Period.

35.     This action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, because it meets all the requirements of Rule 23(a)(1–4), in that it satisfies the numerosity, commonality, typicality, and adequacy requirements, and it satisfies the requirements of Rule 23(b)(2) and/or 23(b)(3). It satisfies the requirements of Rule 23(b)(2), because Nationwide has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. It also satisfies the requirements of Rule 23(b)(3), in that the predominance and superiority requirements are met.

36.     There are approximately seven thousand six hundred (7,600) National Class members spread throughout the United States.  There are approximately five hundred fifty (550) Florida Class Members spread throughout Florida.  Thus, the members of the Class are so numerous that their individual joinder herein is impractical.

37.     There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to, whether Nationwide breached its fiduciary duties to the Class and the appropriate remedies for same.  The common questions of law and fact predominate over questions affecting only individual class members, in that the Court and the parties will spend the vast majority of their time resolving common issues.  Indeed, the only individual issues will be the exact amount of revenue sharing payments recoverable by each Class member, the calculation of which will ultimately be a ministerial function.

38.     Plaintiff, who is a member of the Class, has claims that are typical of all the members of the Class.  Plaintiff's claims arise out of the same uniform course of conduct by Nationwide and arise under the same legal theories as all the other members of the Class.

39.     Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in employee benefits and class action litigation, and counsel have agreed to advance the expenses necessary to vigorously prosecute this litigation.

40.     A class action is superior to all other feasible alternatives for the resolution of this matter.  Class members are almost entirely unaware of Nationwide's breaches of fiduciary duty, such that they will never bring suit individually.  Furthermore, even if they were aware, the claims of many Class members would be too small to economically justify individual litigation.

Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially lead to inconsistent results.

41. Nationwide has acted on grounds generally applicable to the Class by uniformly subjecting them to the revenue sharing scheme described above, which scheme Nationwide has made clear it intends to continue to perpetrate in the future. Accordingly, an accounting, final injunctive relief and equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## VI.   FIRST CAUSE OF ACTION — BREACH OF FIDUCIARY DUTIES

42. Plaintiff realleges and incorporates herein Paragraphs 1 though 41 as though fully set forth herein.

### A.   *NATIONWIDE IS A FIDUCIARY AS TO THE ACCUMULATION UNITS.*

43. Nationwide is an agent and/or trustee and, thus, a fiduciary of Class members under state law as to the accumulation units because (a) they are plan assets, and (b) Nationwide holds them (legal title and physically) for the benefit of Class members. As a fiduciary in connection with the accumulation units, Nationwide is prohibited from receiving benefits in connection with them not specifically agreed to by Class members in their annuity contracts with Nationwide.

### B.   *NATIONWIDE IS ALSO A FIDUCIARY AS TO THE REVENUE SHARING PAYMENTS.*

44. The revenue sharing payments themselves constitute plan assets in Nationwide's hands because Nationwide received the payments as a result of its fiduciary status or function (*i.e.*, because Nationwide receives payments from mutual funds as a result of its fiduciary holding of the accumulation units). In other words, the revenue sharing payments effectively constitute the proceeds of Class members' and participants' investments. Nationwide is,

therefore, deemed to be holding the revenue sharing payments for Class members, making it a fiduciary to Class members in that regard as well.

C.    NATIONWIDE BREACHED ITS FIDUCIARY DUTIES AS TO CLASS MEMBERS.

45.    As a fiduciary to Class members in connection with the accumulation units and the revenue sharing payments, Nationwide owes Class members the duty of utmost honesty and good faith in connection with its dealings with the accumulation units and the revenue sharing payments.  This includes the duties to use those assets strictly for the benefit of Class members, to refrain from self-dealing in connection with those assets and to turn over any amounts it receives or profits it makes in connection with its dealings with those assets.  Nationwide's arranging for and retaining (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates these fiduciary duties.

D.    CLASS MEMBERS ARE ENTITLED TO EQUITABLE RELIEF.

46.    Class members seek an order:  (i) granting an accounting of each 457(b) plan's investments and related revenue sharing payments; (ii) declaring that the above-described practices of Nationwide in connection with the revenue sharing payments violate its fiduciary duties as set forth above; and (iii) granting a permanent injunction preventing Nationwide from engaging in such conduct in the future.

47.    In addition, Nationwide must disgorge to Class members all of the revenue sharing payments received by it, its subsidiaries or affiliates.  Upon information and belief, those revenue sharing payments received by Nationwide during the Class period are in the tens, if not hundreds, of millions of dollars.

E.    DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE.

48.    NFS is the parent company of both Nationwide Life and NRS.  The revenue sharing scheme represents a joint business enterprise conducted by all three Defendants.

Pursuant to that joint enterprise, NRS solicited the business of Class members, thereby selling Nationwide Life's annuity contracts along with its services as a deferred compensation plan administrator, resulting in payment of the revenue sharing payments to one or more of the three Defendants or their subsidiaries or affiliates. The revenue sharing scheme was conceived of and implemented exclusively or primarily by NFS employees. The revenue sharing payments ultimately flow to and/or benefit NFS, as the parent company of Nationwide Life and NSR. As participants in a joint business enterprise, all three Defendants are jointly and severally liable to disgorge the revenue sharing payments.

### VII.   SECOND CAUSE OF ACTION — RESTITUTION

49.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 48 as though fully set forth herein.

*A.   EVEN IF NATIONWIDE DID NOT BREACH ANY FIDUCIARY DUTIES, CLASS MEMBERS ARE ENTITLED TO RESTITUTION.*

50.   As an agent and/or trustee, and thus, a fiduciary, Nationwide is liable for restitution for any enrichment which it is unjust for it to retain, even if it committed no breach of fiduciary duty. Under the circumstances, it is unjust for Nationwide to retain the revenue sharing payments even if it did not breach any fiduciary duties as to Plaintiff and the other Class members. Accordingly, Nationwide is liable in restitution to Class members for the amount of the revenue sharing payments it received.

*B.   DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE.*

51.   NFS is the parent company of both Nationwide Life and NRS. The revenue sharing scheme represents a joint business enterprise conducted by all three Defendants. Pursuant to that joint enterprise, NRS solicited the business of Class members, thereby selling Nationwide Life's annuity contracts along with its services as deferred compensation plan

administrator, resulting in payment of the revenue sharing payments to one or more of the three Defendants or their subsidiaries or affiliates. The revenue sharing scheme was conceived of and implemented exclusively or primarily by NFS employees. The revenue sharing payments ultimately flow to and/or benefit NFS, as the parent company of Nationwide Life and NSR. As participants in a joint business enterprise, all three Defendants are jointly and severally liable for restitution of the revenue sharing payments.

## VIII.  JURY DEMAND

52. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff and the Class demand a trial by jury. Plaintiff will pay any jury fee contemporaneously with the filing of this Complaint.

## IX.  REQUEST FOR RELIEF

53. Wherefore, Plaintiff and Class members demand judgment against Defendants Nationwide Financial Services, Inc., Nationwide Life Insurance Company and Nationwide Retirement Solutions, Inc., jointly and severally, for an accounting, a declaratory judgment, a permanent injunction and disgorgement or restitution, all as set forth above, plus pre-judgment and post-judgment interest at the maximum possible rates, whether at law or in equity, and all such other and further relief, general or special, legal or equitable, to which Plaintiff and Class members may be justly entitled.

          Respectfully submitted,

_____
Scott E. Smith (0003749)
Trial Attorney
SMITH, PHILLIPS & ASSOC.
1225 Dublin Road
Columbus, Ohio  43215
614-846-1700
614-486-4987 (Fax)
SES@SmithPhillipsLaw.com

Roger L. Mandel
Trial Attorney
Marc R. Stanley
Martin Woodward
STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, Texas  75205
214-443-4300
214-443-0358 (Fax)

Jeffrey C. Engerman
Trial Attorney
LAW OFFICES OF JEFFREY C. ENGERMAN, PC
12400 Wilshire Boulevard, 15th Floor
Los Angeles, California  90025
310-207-7777
310-207-7779 (Fax)

Allen C. Engerman
LAW OFFICES OF ALLEN C. ENGERMAN, P.A.
Sanctuary Centre
4800 North Federal Highway, Suite 100-D
Boca Raton, Florida  33431
561-392-2222
561-392-2123 (Fax)

Edward Siedle
79 Island Drive South
Ocean Ridge, Florida  33435
561-202-0919
561-202-0191 (Fax)

**OF COUNSEL**